Good morning, Your Honor, and may it please the Court. My name is Robert Hyde. I'm with the law firm of Hyde & Swigert in San Diego. We represent the appellant in this matter and the plaintiff in the underlying case. If I could, I would like to reserve seven minutes of my time for review. Certainly. Thank you, Your Honor. The primary issue in this case involves a bona fide error defense of the Fair Debt Collection Practices Act and the complementing section of the California Rosenthal Act. Both of them are affirmative defenses. Here it is undisputed that the appellee, Rosenthal and Loeb, violated both acts when they garnished the appellant's wages a second time after getting a judgment in state court here in California. And when they garnished the wages the second time, the debt had already been paid in full four months prior to that. In Reichert v. National Credit Services, the court held that the Fair Debt Collection Practices Act has a strict liability statute but that the debt collector may avoid liability if the debt collector can demonstrate the bona fide error. The FDCPA defines the bona fide error as having three elements, all of which must be satisfied if the debt collector is to prevail on the defense. The first element is that the error must be unintentional. The second is that the error must be bona fide, that is, the error must not be made in bad faith. Finally, such an error must be taken place notwithstanding the fact that the debt collector maintained procedures reasonably adapted to avoid the specific error at issue. And here the error at issue is that the appellant's wages were garnished twice the second time after he had already paid them. Well, three is maintain procedures reasonably adapted to prevent the violation. Yes, Your Honor. If I missed the word reasonably, then I apologize. Here Rosen and Loeb speculates that the reason it garnished Mr. England's wages twice is because a former employee of Rosen and Loeb, a woman by the name of Mary Ortiz, made a good faith error when she was doing her job. But courts have repeatedly held that when an employee makes a good faith mistake, that alone is not enough to sustain the bona fide error defense. Instead, the collector must demonstrate that all three elements have been satisfied. In a case out of Massachusetts, Guthera v. Credit Control Services, the court made this very point when a debt collector pointed to a number of procedures in a well-trained employee that made a mistake in handling an account. In Guthera, the court noted that while such service may, I'm sorry, such evidence may be enough to avoid a claim of bad faith under the second element of the bona fide error, it is not enough to prove the existence of the third element, which I believe is the most important element to this particular case. I agree with you. And what do you think was, I agree with you that this case turns on the, whether or not the procedures that were in place were reasonably adopted to avoid the kind of violation, you know, the second wage garnishment. So why don't you explain to us why you think the procedures were not reasonable? Well, Your Honor, the only procedure that was really submitted was, I have a copy of it here. It's on page ER-437. It's called Procedure for Retrieving Errant Capital Management Files. It's a procedure that allows Rosen and Loeb to download the files from the Internet from the original creditor so that they can put them into the system. The procedure says this. It's a very simple procedure. It says payment file, download from the website, save to local computer, print out and give the bookkeeper for posting a payment. That's their procedure. That's what they relied on, they say. However, at no time was a procedure discussed with regard to garnishing the wages or discovering that the wages had, I'm sorry, that the debt had previously been paid. For example, at no time did Rosen and Loeb ever ask for a file from the previous law firm that had actually done the garnishing, the law firm that had gotten the judgment against Mr. Englund. At no time did they ask for the creditor for its file. They passed on that. What about simply calling the debtor? I agree, Your Honor. As a matter of fact, I have four here. At no time did they ask the state court if the judgment had been paid off and fulfilled. And finally, at no time did they contact the consumer, Mr. Englund. If they had simply contacted him, if they had called him or if they had sent him a letter and said we're going to garnish your wages, this was formal. You would have said I paid. You would have said I paid, and presumably, I mean, I've met Mr. Rosen. They seem like reasonable people. Presumably, they would not have garnished his wages. What about some additional redundancy in the office? I agree, Your Honor. As a matter of fact, there was a case out of Arizona. It's the Isham case. It's Isham v. Gerstle, Stalek, and Chargo. And in that case, the court talked about the redundancy of the office.       We're going to do it. We're going to do it. That was a situation where the court looked to why they didn't have somebody following up. And in this particular case, they simply download the file, they enter it into their book, they call it their bookkeeping system, and they presumably then take it, make it a negative, take it from the accounting, and after that, they don't garnish any more wages. Let me understand this picture. So this is a debt collection agency that comes into play after prior debt collection agencies and the creditor themselves have not been able to, presumably. Actually, Your Honor, in this case, we had an original debt, which was a credit card debt. It was purchased by what has commonly been called a debt buyer. That's Aaron Capital Management. They purchased these debts for the purposes of collecting on them. It was handed over to a law firm by the name of Eltman, Eltman & Cooper, a law firm out of New York. Eltman & Cooper claims to have served my client. He says he was never served. After that, Eltman, Eltman & Cooper got into some snafus in the New York court. They were accused of sewer service, of not serving people properly, which is exactly what happened. In this case, Eltman & Cooper got out of the case in California and gave it to Rosen & Loeb. And in my opinion, the reason that the procedures here cannot possibly be considered to be reasonable procedures is because, as Mr. Rosen stated in his deposition, at no time after they got the case, did they do what I think most lawyers, hopefully we would agree that most lawyers would do, when another law firm hands you a case and says, here, take over the case. They didn't ask for a file. They had no file. They didn't get the previous file. They didn't ask for the creditor's file. They didn't ask to, they didn't go to the court. You can go on the Internet and in about 45 seconds you can find out that the judgment has been satisfied. You can go out on the docket. You can go out on the docket, exactly. And as you mentioned earlier, they didn't go out and speak to Mr. England. They didn't call him. And they called him many times previously. Can I ask you, in considering the third factor, would it also be permissible for the court to look at the training that the witnesses testified was regularly given to all the employees in the law office, and also I believe Ms. Chertok, the supervisor, testified that she periodically audited or double-checked the work of the bookkeeper to make sure that she had entered all the information correctly. Is that, would that be considered part of the procedures that the law firm has? I don't think that that's procedures. I think, as you mentioned, it's training. And if you look at, if you look at this Arizona case, the Ishan case versus Gerstow, Stalik, and Shargo, that actually came up in that case. And we've submitted that on a 26J letter. I just found out about that case a couple days ago. And in that case, they were talking about training. As a matter of fact, they didn't talk simply about training. In that case, the declarators submitted all kinds of training. They submitted declarations about what they had done. They even had a compliance committee that reviewed what was done. And still, the court in the Ishan case said that the bona fide error could not be applied in that case, because there are no procedures in place that would reasonably adapt. What would your position be? What element of the test would that evidence relate to? It's certainly not irrelevant. That's not what you're saying, is it? I don't think it's irrelevant, Your Honor. I think it goes to whether or not it was bona fide error. That is the second element. Whether or not they were doing this in bad faith. It might even go to the first element, that is whether or not it was unintentional. But why wouldn't an audit practice be a reasonably adapted procedure to make sure that the data actually got entered and credited? Well, now, we were talking earlier about training. If we're talking about an audit practice, I think an audit practice might be considered to be a reasonable procedure, if the audit practice is designed to catch garnishments. The problem is, in this particular case, Mr. Rosen testified, and so did his employees, that they really don't do anything. They get a spreadsheet with a list of numbers on it, a list of accounts and names, and then they go out and they garnish the wages. In fact, Mr. Rosen testified that, I'm sorry, not testified, but he stated during his deposition, that once, the best procedures they can come up with is that they simply garnish the wages and they wait to see if the consumer complains about it, or, in the alternative, they file a garnishment and they wait for the sheriff's office or the clerk of the court to come back and say, hey, you've already garnished these wages, this debt has already been satisfied. So in this particular case, there was no audit. I don't think there was any training, but even... Well, there was testimony by both the bookkeeper and the supervisor that they got monthly training and they gave them exams, they took tests, and depending on how they did on the tests, they might have to do some more training. Are you ignoring that? No, I'm not ignoring that, Your Honor, but I think that a generalized training about the FDCPA is not the same thing as saying, we have a procedure in place to make sure that wages are not garnished twice. Here, in this particular case, it would have been very simple. They could have gone out, they could have checked the docket, as Judge Wardlaw said, they could have gone out and talked to Mr. Englund, they could have talked, they could at the very least, I mean, I think we'd all agree this room is filled with mostly with attorneys or people who have previously been attorneys. What lawyer, what law firm takes on a case and does not even ask for, takes a case from the previous law firm and does not even ask for the following? Doesn't file, doesn't ask what was done. They simply began garnishing his wages again. You have three minutes and you wanted to save seven. All right, Your Honor, I think with that, why don't I give Mr. Rosen a chance and we'll see if there's anything to rebut. Thank you very much. Good morning, Your Honors. Starting, I would just like to say that I am well aware that no debtor's attorney has ever seen a case of bona fide error. It's never happened. They don't believe it exists. But in this case, you have to know that this is an error because no debtor's attorney has ever seen a case of bona fide error. No debt collection firm would ever think that a debtor's going to pay his debt twice. It's a nonstarter. You would never do this intentionally or even sloppily because it can't possibly succeed. I don't follow you. If you've paid me, you've paid your debt. And now I come back at you and say I want you to pay your debt. Why are you even in the picture if I've paid my debt? In this case, apparently what happened is Eltman, who had the file originally, did a garnishment. They then transferred the file to us because for whatever reason, Aaron wanted it away from them. But debtor... Counsel made some allusion to Aaron was already accused of some... No, not Aaron, Eltman. I know nothing about Eltmans. I don't even know if they had problems in New York. Wait, is this your firm that we're talking about? Rosen and Loeb, yes, ma'am. And you're Rosen and Loeb. I am, yes, ma'am. I'm sorry. I should have introduced myself. I'm Alan Rosen. I got nervous. Okay. So if I were a debtor who was in this situation, I mean, having my wages garnished twice would be a really serious... Horrible. This is our worst nightmare. How easily prevented? Not as easy as you'd think. But it has been prevented, and we did prevent it for 20 years. Well, how do we know that? Well, I've testified to that under oath. We've never had this happen ever. And I don't really understand how it happened this time. So what's your best explanation for how it happened this time? Well, Ms. Chertok downloads the information. Downloads from where? From Erin. Erin gets money, apparently in this case... What about a file? Do you get any files or records or anything? Nowadays, we don't get files. We get maybe a thousand things to collect. They're done electronically. It's all done with computers. I mean, I'm old school, as I'm guessing you guys are, where we had a paper file and we kept it and we copied it and we put little holes in things and put... The reality of today is that these debt buyers buy 10, 20, 30,000 accounts at a time. I was talking with my law clerks about that. That's the problem. It's that there's so many that it's almost impossible for you to have reasonable procedures. Because you're just inundated with so many claims, and so it's no longer about the individual debtor where it comes from. It could be their whole financial precarious situation at stake. It's about the overwhelming load on the collection agencies. It's because of that overwhelming load that we desperately cling to our procedures, because without our procedures, it would be chaos. But you don't have much of a procedure here. You don't check with the courts. You don't check with the debtor. Well, let me address that then. Why did it go from one computer to the other automatically? They talk to each other now. I know, and I'm unwilling to rely on a system that has no human involvement. I don't think we're quite there yet. But in this case, we have not one but two humans working on this problem. Yeah, but you testified that the person who is like the redundancy in your system, it's not routine. It's not a daily basis. It's just occasionally that she will check. She does spot check it to make sure, but remember... It's not spot checking. It's not. I mean, you're saving money by not having a routine redundancy. And I understand you're not the first debt collector in this situation. But it seems to me that there ought to be more and that the act intended that there be more to protect debtors, especially in these days when there's so many people suffering from the financial crisis. Well, believe me, we strive ever so hard to do this. I believe you are here on good faith and you are embarrassed by this and like you don't, you're sorry it happened, you didn't want it to happen. But I'm just suggesting that the third prong of the legal standard may not have been met. The third prong doesn't mean that you have something in place that means it will never, ever happen. What it means is that you have procedures that are reasonably adapted to minimize or stop it from happening. But when humans are involved... But what's the error here? The error is actually going to court and filing a wage garnishment. That's a huge, I mean, the error is not that there was a mistake made in the downloading or by your employees. The error is that you actually filed a wage garnishment which should not have been filed. Had it been properly downloaded, it never would have been filed. It's only filed because that payment wasn't downloaded properly. Once it's not downloaded properly and you're about to go take the affirmative step of going to court and garnishing someone's wages, shouldn't there be something in there that would prevent a mistake in garnishment? Here's the problem. Looking at the court docket doesn't help you. The docket will tell you that a writ had been issued and returned. It doesn't tell you whether the money was collected necessarily or even if it was successful. They may have served the writ on a former employer and the guy wasn't employed there anymore. So the docket doesn't tell you that. Talking to the client, the owner of the debt, they only get electronic reports, of course, from the first attorneys. They don't have a file. What about calling the debtor? Well, it's not easy to call a debtor. We often don't have good phone numbers for the debtor. We oftentimes, we get their employment information often from credit reports. So you have their employer. What about calling their place of employment? Well, usually those avenues have been exhausted. In this case, it was a finished judgment. All of those things, calling the debtor, trying to get them to voluntarily pay, do those things, are done before the matter goes to judgment. What about a letter saying we're going to garnish your wages unless you make this payment? And then that puts the debtor on notice and he can tell you, but I've already paid this. It didn't come up in this case, but our standard procedure is we always send a letter like that prior to that. As you know, a judgment has been entered. Our client has authorized us to accept certain percentage. I don't know if it was done in this case, but it is part of our routine. Was it done in this case or not? I don't know. I'd have to look at it. It never came up. Isn't that something to be litigated? Because this is summary judgment, right? Yes. So isn't that still a genuine issue, a material fact, whether that happened? I don't know if that's a necessary component. It would simply add, I guess, more luster to it. But if the procedures are reasonably adapted to prevent the problem, it doesn't matter whether we happen to send that letter. And there's nothing to say that letter would even be responded to. I think that would make it more reasonable than doing nothing. Well, we don't know whether this happened in the past or not, because most people would just blow it off, forget about it. Right. I mean, so that, you know, a simple thing would have been to have. I don't use a computer. I don't intend to start using a computer. And I love my colleague because he's got everything there. And if our employment, if our caseload drops and we become unemployed, he'd probably be the greatest court reporter in history. He is fast, 180, 190 words a minute, and accurate and meticulous. So it happened. It happened because we live in this impersonal world. And if they try to call you, they probably have to push 15 buttons. And then a personal answer. And finally, you push the O and they say, oh, we'll transfer you. And boom, they push another button and then nobody answers on the other line. You go through that maybe for an hour. And most people just, you know, they want to shoot themselves. So frustrated about it. We've all been through those experiences. So that's part of the cost of living in this wonderful, modern, fast-moving world. And I mean, we get the credit card people and, you know, you don't pay them. They double the interest rate. And then they turn around and they sell it. What do they sell it for? How much on the dollar? It varies, but sometimes it could be five or seven cents on the dollar. It depends on how old they are and how much they've been working. And so they evaluate it and then they put a price on it. And they take a deduction. They get some money. And then somebody else goes through the field and picks the second crop, maybe. Gleans the leftovers. So here, beginning your wages, garnished. I thought that was the word. But anyway, that's, you know, the employer gets that. He doesn't want to hear about this or that. Right away, they wonder, do we want this guy around? He's a deadbeat. They got to keep coming after him. I don't need those headaches. Well, but we wrote it puts them in puts them in danger. And then it goes to the credit reporting. And then you try to do something about that. And then they can spend. They can spend months and months trying to straighten that out. So let me ask you this. Is it still California law that if your wages are attached, you can go into the marshal's office and fill out an exemption claim? Yes. Get half the wages back? Yes. I'm glad to hear that. I have to tell you this. I used to fill out those exemption claims, type them up myself, notarize them, take them over and file them. Cost $3. I met a lot of nice people that way. Enough to pay the phone bill. We contacted the employer of the debtor and explained to them that it was our mistake and that there was no other. Yeah, but you know what? We refunded the money instantly, of course. It had been easy just to have you could have one computer talk to the other, right? It's possible to do. So now you've benefited, you've learned a lesson, and so you get modern. We like to think we're fairly modern. But things change so much. It's just like what goes on in today's world. The public be damned, and computers are supposed to talk to each other. You can't get a live person. And so you just take this stuff and you mine it again. You make money out of it. And so once in a while things happen. Somehow it went to the wrong place. But it causes a lot of grief to people. Sleepless nights, lose weight, all that. A couple other points that were raised in the briefs. One, the appellant claimed to think that because nobody knew what happened, that that was somehow relevant. But in the case of Mirabel v. GMAC, it stated that the proof is not required as to exactly what happened. There are times when you don't know what happened. You come home, there's a broken glass on the floor. Maybe it flew off from a gust of wind or the cat knocked it off or there was a small earthquake. You don't know what happened. You see the error, but you don't know. I think the district court here misanalyzed what the error was. Because when the district court was the district court thought the error was the failure to record the notification of the payment of the judgment. And said that was unintentional. But I don't think that was the error. The error has to be what was the violation of the act. Failure to record did not violate the act. It was filing the second wage garnishment that violated the act. So I think the district court was kind of confused about that. But the question becomes, was the second, was the filing of the second garnishment intentional? No, the question is, were there procedures in place to avoid the second filing of the garnishment? And the way you avoid it is by properly accounting for the monies received. That's how you avoid it. Because once the money is posted, then the account zeros out. And the next step, somebody goes to look at it, there's nothing owing. They don't issue a garnishment. But for the posting of the money, no garnishment. You've got to take that element out of it. One computer tells the other. They talk to each other, they're good friends, and then it prints it right out. Isn't that the way it works? Then there's a power surge, and you never know what's going on. If there's a power surge, you know that. The clock doesn't work anymore. I understand. The other thing I want to address is we do not rely on the court clerk to tell us things. What I had said in my deposition in passing was that it was sort of a black cloud over this particular file, because since the writ had been issued and returned satisfied, the clerk normally wouldn't issue another writ, but for some reason they did. I'm not saying we rely on that. I'm just saying another odd feature of this is that that didn't get kicked either. Can you think of ways that you could avoid this happening in the future? Have you thought about that? Yes. The couple ways that we've thought of is that we could have Ms. Chertok stand at the bookkeeper's desk until the bookkeeper enters each item. That's one way. I'm not sure that that's the best way. Theoretically, we could put more people on the job, have somebody check Ms. Chertok's work and somebody check the bookkeeper's work. But it's hard to understand how if this mistake was something that the procedures were not designed to prohibit, why it's only happened once in 23 years. But we don't know that. I do know that. Well, you know that you haven't had a complaint. Right, in 23 years. Nobody pays their judgment twice. Nobody pays their debt twice. Yeah, but they could get it and they could work things out. Some people pay it twice. Listen, I've paid a bill and then it comes, I get another one and I think, well, did I pay that or didn't I pay it? And I pay it again. And then a year later, the phone company gives me a refund. And I'm so happy. In my experience, debtors do not pay their debts twice. It's trouble enough to get them paid once. I'm sure somewhere in the history of the world. And they got in trouble because they listened to the credit card companies that keep feeding you credit cards. I agree with that. The answer to all this is credit cards are a convenience. But you've got to think that you've got to pay it right away as soon as it comes in. And otherwise don't buy anything. So anyway, this is not a tragedy. We hear tragedies all the time. So I wouldn't worry about it. It's not the end of your career. I appreciate that. I mean, nothing. I mean, is this the only trouble you've got in life? No, no, I've got a couple others. Not here telling you I have a problem. Thank you. Thank you, Mr. Rosen. Why are you coming back? Your Honor, if I could address a few things that just came up. You're like a bill collector. You never want to quit. Well, I think we're almost finished here. Mr. Rosen says this has never happened in 20 years. I would call the Court's attention to the record. It's ER 433. An employee of Rosen & Loeb, Patricia Diaz, admits that on the same day that this error occurred, they also lost ten other accounts. There were ten other payments that were not credited to the system. Now, of course, that wasn't our cases. I don't know what happened to those. Perhaps they corrected them eventually. But this happened at least ten times on that day. How did they know that? Well, I think they went back and looked through the paperwork and found this entry. And it's part of the record. And they have this list of documents, people who were not paid. There's no evidence in the record that there were second garnishments served on the nine or ten others. No, Your Honor. In fact, I would be surprised if that happened. The point is that the debt here that brings you today was on the same sheet of paper with the other debts. That's correct. And we just don't know what happened. No, we don't. And I'm not suggesting that. But I am suggesting that the idea that this has never happened I think is somewhat questionable, because if they don't know it. I think the best way to describe it would be as Judge Pregerson described it. This is the first complaint they've had in 23 years. That's correct, Your Honor. With regard to the docket, Mr. Rosen indicated that it doesn't do any good to go out and look at the Internet and look at the docket. That's not true. If you go out there, they have a satisfaction of judgment, and they're required to file that, and the satisfaction of judgment becomes part of the docket. I thought the testimony was no satisfaction of judgment had been filed in this case. Well, no satisfaction of judgment had been filed. So if you looked at the court docket, it wouldn't show a satisfaction of judgment. I see what you're saying. It hadn't been filed. I don't know if that came up, Your Honor. Well, I read it in the records, so, yeah, I study these things. I read the stuff that you guys produce. Oh, I understand that, and I do appreciate that. I do appreciate that. Finally, with regard to Mr. Englund. You better get through. You've got 30 seconds. I understand. With regard to Mr. Englund having his wages garnished a second time, we're talking about the impact that has. In this case, this was a gentleman who was working for a Federal contractor. He had a Federal security clearance, and having his wages garnished actually ended up impacting him. He didn't lose his job at the contractor's, but he was demoted. He was placed on he had to have a security clearance. He lost his security clearance, and so they put him on projects that did not require a security clearance. I've only got six seconds, so with that, Your Honor, I guess maybe I should. Well, no, no, you was 11 seconds, 12 seconds. Oh, that's a plus. It's just like the police. When it turns red, you have to stop. I understand. Thank you very much, Your Honor. You know, we'll do next time you're here, we'll deduct 24 seconds. I think our computers will come up. All right.
judges: Pregerson, Wardlaw, Tallman